**THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| Civitas Capital Management, LLC, CMB Texas Regional Center, LLC, Visitar's Business Alliance of Texas Regional Center and DC Partners, d/b/a Houston EB-5 Regional Center, Invest in the USA, USA EB5 Immigration, LLC d/b/a EB-5 Capital, CanAm Enterprises, LP, American Life, Inc. Regional Center – Seattle d/b/a Golden Rainbow & Gateway Freedom Fund, Advantage America New York Regional Center, LLC, American Dream Fund, LLC, EB-5 New York State, LLC, PG EB5 Sponsor, LLC, Pine State Regional Center, LLC, and Advantage America EB-5, <br> *Plaintiffs* <br><br> v. <br><br> Alejandro Mayorkas, Sec., DHS, Ur Mendoza Jaddou, Dir., USCIS, Alissa Emmel, Chief, IPO, USCIS, <br> *Defendants* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) **Case No**.: |

## INTRODUCTION

1.     This case challenges the portion of a final rule issued by the Department of Homeland Security ("DHS") on January 31, 2024 ("Final Rule") that relates to government filing fees for EB-5 related petitions, which  increases such fees commencing April 1, 2024, by astounding amounts (in excess of 200%) in clear violation of the EB-5 Reform and Integrity Act ("RIA"), the Regulatory Flexibility Act ("RFA"), the Immigration and Nationality Act ("INA"), the Administrative Procedure Act ("APA") and internal guidelines as established by the Office of Management and Budget ("OMB"). 89 Fed. Reg. 6194 (Jan. 31, 2024), *as corrected*, 89 Fed. Reg. 20101 (Mar. 21, 2024).

2.     The Final Rule revises United States Citizenship and Immigration Services ("USCIS") filing fees for all petitions and applications adjudicated by USCIS. The filing fee increases for EB-5 related petitions are far greater both in dollar amounts and in percentage increases than any other filing fees. This Complaint only challenges the EB-5 filing fees in the Final Rule.

3.     The following chart sets forth the EB-5 fee increases in the Final Rule, including the amount of the increase and the percentage of the increase:

| Form | Previous Fee | Final Rule New Fee | Percentage of Increase |
|------|-------------|-------------------|----------------------|
| I-956G Regional Center Annual Statement | $3,035 | $4,470 | 47% |
| I-956 Regional Center Application | $17,795 | $47,695 | 168% |
| I-956F Application for Approval of an Investment in a Commercial Enterprise | $17,795 | $47,695 | 168% |

| | | | |
|---|---|---|---|
| I-829 Petition by Investor to Remove Conditions | $3,750 | $9,525 | 154% |
| I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor | $3,675 | $11,160 | 204% |

89 Fed. Reg. at 6198-6205 (Table 1).

4.      DHS concedes, in the preamble to the Final Rule, that it failed to comply with the RIA's requirement that it conduct a fee study within one year and prior to setting fees for the revised EB-5 program,  that it failed to comply with the requirement of the RIA that it set fees for the EB-5 program that will enable USCIS to meet congressionally-designated processing times and that it failed to comply with the RFA requirement that it determine the economic impact of the Final Rule on small entities. *Id.* at 6286 ("DHS realized that the EB-5 Reform and Integrity Act of 2022 instructs DHS to complete the required fee study within one year…"); see also, *Id.* at 6375 (Regional centers are difficult to assess because there is a lack of official USCIS data on employment, income, and industry classification for these entities. It is difficult to determine the small entity status of regional centers without such data.")

5.      DHS admits, in the preamble to the Final Rule, that it failed to determine the actual cost of services related to EB-5 petitions as required by INA § 286(m), that it relied on inaccurate and incomplete information in proposing EB-5 fees in the Notice of Proposed Rulemaking ("NPRM") and that it did not change the proposed fees in the Final Rule despite those fees being based on admittedly flawed data. *Id.* at 6287.

6.      The Final Rule is arbitrary and capricious, as Defendants based the rule on faulty projections, flawed assumptions, and failed to take into account public comments on the rule.

4853-7042-0140, v. 4

## JURISDICTION

7.      Jurisdiction in this case is proper under 28 U.S.C. § 1331, 5 U.S.C. § 701 et. seq.,

and 28 U.S.C. § 2201 et. seq.  Relief is requested pursuant to said statutes. Specifically, this Court

has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which provides that "district courts

shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties

of the United States." Further, the Declaratory Judgment Act, 28 U.S.C. § 2201, provides that: [i]n

a case of actual controversy within its jurisdiction…any court of the United States, upon the filing

of an appropriate pleading, may declare the rights and other legal relations of any interested party

seeking such declaration, whether or not further relief is or could be sought." Review is also

warranted, and relief sought, under the Administrative Procedure Act, 5 U.S.C. §§ 701 et. seq.,

702, 706(1) and 55(b). Finally, review of agency actions for RFA compliance is provided by 5

U.S.C. § 611(a).

8.      The Final Rule is final agency action subject to judicial review pursuant to 5 U.S.C.

§ 704 and § 706.

9.       Plaintiffs have standing to challenge the Final Rule under 5 U.S.C. § 702 because

they have been and will be injured by the Final Rule. They are also within the zone of interest of

the INA, which established the fund into which application fees are collected.

## VENUE

10.      Venue properly lies within the Northern District of Texas pursuant to 28 U.S.C.

§1391(e) in that this is an action against officers and agencies of the United States in their official

capacities, brought in the District where multiple plaintiffs reside, and where critical investment

and other events have occurred.  Plaintiffs Civitas Capital Management, LLC and CMB Texas

Regional Center, LLC, along with a number of their EB-5 investment projects, are all located in

Dallas, Texas.  For example, CMB Texas Regional Center, LLC's (and its affiliates) thirteen (13) Dallas-area projects have involved 599 investors, investments of $322.7 million, and created 15,612 jobs. CMB Texas Regional Center, LLC's (and its affiliates) other Texas investments have involved 196 investors, investments of $100 million, and created 5,679 jobs.

## PARTIES

11.    Plaintiff Civitas Capital Capital Management, LLC owns and operates several regional centers, including the Civitas Texas Regional Center. Civitas projects in the Dallas-Fort Worth area have involved 776 investors, investments of more than $401 million, and created 12,432 jobs. Civitas projects in the rest of Texas have involved 347 investors, investments of more than $194 million, and created 6,308 jobs. Civitas is headquartered in Dallas, Texas.

12.    Plaintiff CMB Texas Regional Center, LLC is an affiliate of CMB Export, LLC. CMB Export, LLC and its affiliates d/b/a CMB Regional Centers own and operate multiple regional centers with geographic scopes encompassing forty-five states and the District of Columbia.  Since its founding, CMB Regional Centers has sponsored one hundred and three investment projects in eighty-six limited partnerships and created approximately 178,000 American jobs. CMB Texas Regional Center, LLC's (and its affiliates) thirteen (13) Dallas-area projects have involved 599 investors, investments of $322.7 million, and created 15,612 jobs. CMB Texas Regional Center, LLC's (and its affiliates) other Texas investments have involved 196 investors, investments of $100 million, and created 5,679 jobs. CMB Regional Centers is headquartered at 5910 N Central Expressway, Suite 1000, Dallas, Texas 75206. CMB Regional Centers employs 55 full-time employees.

13.    Plaintiffs Visitar's Business Alliance of Texas Regional Center and DC Partners d/b/a Houston EB5 Regional Center are headquartered at 2425 W Loop S, 7th Floor, Houston,

Texas 77027. Visitar's Business Alliance of Texas Regional Center operates an investment project at 1293 N US Highway 87, Fredericksburg, Texas 78264. Houston EB5 Regional Center operates an investment project at 1701 Allen Parkway, Houston, Texas 77019. The two regional centers employ a total of fourteen (14) people.

14.    Plaintiff Invest in the USA ("IIUSA") is the national membership-based 501(c)(6) non-profit trade association for the EB-5 Regional Center Program. IIUSA's membership is comprised of over a hundred regional centers serving forty-seven states and territories. IIUSA's members have raised billions of dollars in foreign investment capital and developed hundreds of projects in the United States that were responsible for creating hundreds of thousands of U.S. jobs.

15.    Plaintiff USA EB5 Immigration, LLC d/b/a EB5 Capital, owns and operates eight (8) regional centers that serve forty-five states and the District of Columbia.  Since its founding in 2008, it has approximately forty completed or ongoing investment projects. It is headquartered in Bethesda, Maryland. Plaintiff EB5 Capital employs 36 people.

16.    Plaintiff CanAm Enterprises, LP owns and operates seven regional centers. In its thirty-seven years of experience, it has operated 63 projects from more than 5,800 EB-5 investors. It has more than 5,000 I-526 petition approvals, and more than 2,500 I-829 petition approvals have been issued to its EB-5 investors. It is headquartered in New York, NY.

17.    Plaintiff American Life Regional Center – Seattle d/b/a Golden Rainbow & Gateway Freedom Fund is located at 2450 6th Avenue South, Suite 200, Seattle, Washington 98134. American Life, Inc. currently owns and operates three regional centers that serve multiple states. It is the longest established operating regional center program in the United States, having completed over forty-five (45) EB-5 projects through equity participation from over 2,500 EB-5 investors. Plaintiff American Life Regional Center – Seattle employs fifteen (15) people.

18.    Plaintiff American Dream Fund, LLC is located at 7755 Center Avenue, #1100, Huntington Beach, CA 92647. The company has two principals and four employees and approximate top line revenues of $5.5 million annually.  This company operates three (3) regional centers. In its 16 years of experience, American Dream Fund has invested in 12 projects, which account for the creation of more than 17,000 jobs. American Dream Fund has more than 1,700 EB-5 investors accompanied by 1,650 I-526 approvals and roughly 1,000 I-829 approvals. It is headquartered in Los Angeles, CA.

19.    Plaintiff EB-5 New York State, LLC owns and operates a regional center covering the state of New York. Since its founding in 2007, the company has invested in projects in various industries including those for essential healthcare infrastructure in very high unemployment areas. In several of its EB-5 investment projects, 100% of the investors have received the full repayment of their investment and I-829 petition approval for unconditional U.S. green cards. Plaintiff EB-5 New York State, LLC is headquartered in Buffalo, New York.

20.    Plaintiff Peachtree Group, officially the PG EB5 Sponsor, LLC, is located at 3500 Lenox Road, Suite 625, Atlanta, GA 3326. This company has no employees of its own, but the affiliates of PG EB5 Sponsor, LLC have approximately 250 corporate employees and more than 2,000 employees at hotels managed by its affiliates.

21.    Plaintiff Pine State Regional Center, LLC was designated by defendant USCIS as an EB-5 regional center in 2014. Focused exclusively on rural manufacturing EB-5 projects, Pine State Regional Center, LLC has sponsored several high-impact, job creating EB-5 projects. The company is headquartered in Little Rock, Arkansas. The company has twelve (12) full-time employees and seven (7) part-time employees.

22.     Plaintiff Advantage America New York Regional Center, LLC is part of the AAEB5 Group. Since its founding in 2013, the company has sponsored multiple job creating investment projects. The company is headquartered in New Jersey. It employs six (6) people.

23.     Defendant Alejandro Mayorkas is the Secretary of the U.S. Department of Homeland Security and is named herein in his official capacity only. He is responsible for overseeing the U.S. Department of Homeland Security and its component agency, the U.S. Citizenship and Immigration Services.

24.     Defendant Ur Mendoza Jaddou is the Director of the U.S. Citizenship and Immigration Services ("USCIS") and is named herein in her official capacity only. She is responsible for overseeing USCIS and all of its operations.

25.     Defendant Alissa Emmel is the Chief of the Immigrant Investor Program Office ("IPO") of USCIS and is named herein in her official capacity only. She is responsible for the operation of the IPO and the EB-5 program.

26.     Defendant USCIS is the component agency within DHS that is responsible for the oversight and operation of the EB-5 program.

## BACKGROUND OF THE EB-5 PROGRAM

27.     Congress created the EB-5 program in 1990 to stimulate the U.S. economy through job creation and capital investment by immigrant investors.

28.     The EB-5 regional center program was later added in 1992 by the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993, Public Law 102-395 § 610, 106 Stat 1828 (Oct. 6, 1992).

29.     As amended, the EB-5 program makes approximately 10,000 immigrant visas available annually to foreign nationals (and their dependents) who invest as least $1,050,000 (or

$800,000 if the investment is in a targeted employment area (TEA) or infrastructure project) in a project or business that will create at least 10 full-time jobs in the United States for qualifying employees, either directly or indirectly. *See* INA § 203(b)(5), 8 U.S.C. §1153(b)(5).

30.    The regional center program was created by Congress as a pilot program which needs to be extended periodically. The program has been extended more than 20 times with extensions ranging from 5 days to 5 years.

31.    DHS regulations define a regional center as an economic unit, public or private, that promotes economic growth, regional productivity, job creation, and increased domestic capital investment. *See* 8 C.F.R. § 204.6(e).

32.    The regional center program has proven to be very popular with foreign investors and now encompasses more than 90% of all EB-5 investments.

33.    The regional center EB-5 program has resulted in investments in the U.S. in excess of $50+ billion by foreign investors and has resulted in the creation of more than 1.35 million jobs in the U.S. IIUSA, *EB-5 Economic Impact in America*, available at https://iiusa.org/resources-data/eb-5-economic-impact/ (last accessed April 5, 2024); *see also*, IIUSA, *Request for Proposals: EB-5 Immigrant Investor Program Economic Impact Study*, available at https://iiusa.org/wp-content/uploads/2024/02/IIUSA-2023-EB-5-Economic-Impact-Study-RFP-final.pdf    (February 2024) (Summarizing how from 2010 to 2015 alone, the program attracted $18.4 billion in foreign investment and created 355,208 American Jobs in 2014 and 2015 alone).

34.    Every facet of the program - - from the certification of a regional center to the approval of an investment project to verifying that an immigrant investor's source of funds is lawful - - is adjudicated using a form. USCIS is entrusted not only with adjudicating these benefit requests, but also promulgating rules and regulations related to the fees associated with each form.

35.     Requests for regional center designation must be filed with USCIS on Form I-956 (formerly Form I-924), Application for Regional Center Designation Under the Immigrant Investor Program. *See* 8 C.F.R. § 204.6(m)(3) and (4). Once designated, regional centers must provide USCIS with updated information to demonstrate continued eligibility for the designation by submitting Form I-956G (formerly Form I-924A), Annual Certification of Regional Center, on an annual basis or as otherwise requested. *See* 8 C.F.R. § 204.6(m)(6)(i)(B).

36.     Before an investor can invest in a project (other than a standalone EB-5 project), the project must be sponsored by a regional center; and the regional center must file a project approval application on Form I-956F. 8 U.S.C. § 1153(b)(5)(F)(i) ("Application for approval of an investment in a commercial enterprise. A regional center shall file an application with the Secretary…for each particular investment offering through an associated new commercial enterprise…").

37.     When an investor invests in a project for which Form I-956F has been filed, the investor can file an EB-5 petition on Form I-526E. 87 Fed. Reg. 51696 (August 23, 2023) ("Form I-526E will be used by an investor pooling their investment with one or more qualified immigrants under the new EB-5 Regional Center Program…"

38.     An investor who invests in a project not sponsored by a regional center files an application on Form I-526. *Id.* ("Form I-526 will be used by a Standalone Investor")

39.     The approval of Form I-526 or Form I-526E enables an investor to file for conditional permanent resident status in the US. 8 U.S.C. § 1186b(a)(1) ("An alien investor…shall be considered, at the time of obtaining status as an alien lawfully admitted for permanent residence, to have obtained such status on a conditional basis…")

40.     Between 21 and 24 months after an investor obtains conditional permanent status, the investor is required to file Form I-829 to prove that the job creation required in connection with the investment actually took place. USCIS approval of the Form I-829 results in the removal of conditions on residence and the investor becoming an unconditional permanent resident. 8 U.S.C. § 1186b(c)(1) ("[I]n order for the conditional basis…for an alien investor…to be removed…the alien shall submit…a petition which requests the removal of such conditional status…"); *see also*, 8 U.S.C. § 1186b(d)(2) ("[Such] a petition…shall be filed during the 90-day period immediately preceding the second anniversary of the alien investor's lawful admission for permanent residence.")

41.     Plaintiffs' regional centers have all filed large numbers of project approval applications, and all anticipate filing large numbers of project approval applications (Form I-956F) going forward.

42.     Plaintiffs' regional centers have all filed annual statements with defendant USCIS and all anticipate filing a Form I-956G every year going forward.

43.     Plaintiffs' regional centers all anticipate the need to file multiple Forms I-956 to notify defendant USCIS of any necessary changes or amendments to their EB-5 filings.

44.     Plaintiffs' regional centers have all had large numbers of investors invest in projects in the regional centers, and they all anticipate large numbers of EB-5 investors having to file Form I-526E going forward based on investments in projects in their regional centers.

45.     Plaintiff regional centers have had large numbers of investors in projects in the regional centers who have filed Forms I-829 in order to remove conditions on their permanent residence, and all plaintiffs' regional centers have investors who already have invested in the regional centers and will be required to file a Form I-829 going forward.

## IMPACT OF THE RIA ON USCIS FILING FEES

46.    Prior to extending the regional center program in 2022, Congress decided that it wanted to reform and improve the EB-5 program before extending it. This resulted in very lengthy negotiations while Congress carefully crafted a comprehensive EB-5 reform bill. As a result of this delay, the regional center EB-5 program lapsed from July 1, 2021 through March 14, 2022. USCIS, *EB-5 Reform and Integrity Act of 2022*, PA-2022-23, available at: https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20221006-EB5ReformAndIntegrityAct.pdf (Oct. 6, 2022) ("Authorization related to the Regional Center Program lapsed at the end of the day on June 30, 2021. On March 15, 2022, the EB-5 Reform and Integrity Act of 2022 was signed into law.").

47.    On March 15, 2022, the President signed the EB-5 Reform and Integrity Act of 2022, Div. BB of the Consolidated Appropriations Act, 2022 (Pub. L. 117-103). *Id.*

48.    The exhaustively-negotiated RIA extended the regional center program through September 30, 2027. 8 U.S.C. § 1153(b)(5)(S).

49.    In doing so, Congress carefully reformed the program to accomplish very specific goals, including (a) various provisions to protect investors from investing in fraudulent projects; (b) establishment of a separate fee ("integrity fee") to fund efforts to investigate fraud; (c) adjusting the minimum investment amounts to $800,000 for investments in a targeted employment area and $1,050,000 for other investments; (d) creating a new procedure for regional center designation; (e) requiring every project to file a project approval application before investors file petitions; and (f) mandating that USCIS process EB-5 related petitions within specific periods of time designated by the RIA as an antidote to unacceptably long processing times that have long burdened the program.

50.    As an integral part of the changes introduced by Congress during the 2022 reauthorization, Congress dictated that, within one year of the reauthorization, USCIS must conduct a fee study; and within 60 days after the fee study, USCIS must establish a schedule of fees that would be sufficient to meet specific processing time goals set forth in the statute. Pub. L. 117–103, div. BB, §106(a), Mar. 15, 2022, 136 Stat. 1103 ("FEE STUDY – Not later than 1 year after the date of the enactment of this Act, the Director of [USCIS] shall complete a study of fees charged in the administration of the program described in sections 203(b)(5) and 216A of the Immigration and Nationality Act…")

51.    On January 31, 2024, DHS published the Final Rule in which it increased filing fees for EB-5-related petitions in some cases by more than 200% despite admitting that USCIS failed to conduct the fee study required by the RIA and failed to set fees at a level that would result in processing times achieving the timeframes set forth by Congress in the RIA.

52.    The plaintiffs have a direct and significant interest in USCIS processing times and filing fees for investors in their projects since higher filing fees and increased processing times will reduce investor interest in the EB-5 program generally and the projects of the regional center plaintiffs specifically.

## CLAIMS

### THE FINAL RULE VIOLATES THE EB-5 REFORM AND INTEGRITY ACT REQUIREMENT THAT USCIS COMPLETE A FEE STUDY PRIOR TO ISSUING A FEE RULE

53.    Plaintiffs repeat and incorporate herein by reference all previous allegations set forth in this Complaint.

54.     One of the expressly-stated objectives of Congress in promulgating the RIA was to ensure timely processing of EB-5-related petitions by USCIS in response to enormously-delayed USCIS EB-5 processing times that often exceed 5 to 7 years

55.     In fact, Section 106 of the RIA is entitled "Timely Processing" and subsection (b) is entitled "Adjustment of Fees to Achieve Efficient Processing". Pub. L. 117–103, div. BB, §106(b), Mar. 15, 2022, 136 Stat. 1103 ("ADJUSTMENT OF FEES TO ACHIEVE EFFICIENT PROCESSING.-Notwithstanding section 286(m) of the [INA]…the Director, not later than 60 days after the completion of the study under subsection (a), shall set fees for services providing such services, including the cost of attaining the goal of completing adjudications, on average, not later than…")

56.     In furtherance of that objective, Congress mandated in Section 106(a) of the RIA that USCIS conduct a study of fees charged in the administration of the EB-5 program "not later than 1 year after the date of the enactment of this Act." Pub. L. 117–103, div. BB, §106(a), Mar. 15, 2022, 136 Stat. 1103.

57.     In Section 106(b) of the RIA, Congress mandated that USCIS set fees for EB-5 adjudications "not later than 60 days after the completion of the study." Pub. L. 117–103, div. BB, §106(b), Mar. 15, 2022, 136 Stat. 1103.

58.     As of the date of this Complaint, more than 2 years after the date of enactment of the RIA, and more than 1 year following the deadline set by Congress, USCIS has failed to conduct the fee study. In fact, in the preamble to the Final Rule, DHS admits that the fee study is "required by the RIA", that it has not complied and that it used a "different…fee calculation method" than what "that law requires". 89 Fed. Reg. 6286.

59.     Nevertheless, in violation of the RIA, USCIS established an all-new fee schedule for EB-5-related petitions without conducting the fee study.  89 Fed. Reg. at 6198-6205 (Table 1).

60.     DHS states that it opted to use the fee model it has always used "and not the parameters required by the [RIA]." 89 Fed. Reg. 6287.

61.     USCIS states in the preamble to the Final Rule that its fee change does not change "statutory fees that [it] cannot adjust." 89 Fed. Reg. 6197.

62.     In fact, EB-5 fees are fees that USCIS cannot adjust pursuant to the RIA, except as specified in the RIA.

63.     In the preamble to the Final Rule, USCIS states that it has finally begun drafting the rule related to the statutorily-mandated fee study. USCIS admits that the EB-5 fees in the Final Rule will need to be changed again following the completion of the fee study. In fact, USCIS specifically expresses that "a separate rulemaking is being drafted to elaborate more on RIA impacts, volume, volume projections and new forms."  89 Fed. Reg. 6375, fn. 353.

64.     Accordingly, setting aside the EB-5 fees in the Final Rule would have no impact once USCIS publishes its rulemaking that is already in process and that would presumably be in compliance with the law.

65.     It is unreasonable, contrary to law and arbitrary and capricious for USCIS to publish revised fee schedule not in accordance with the law while conceding that another revised fee schedule in conformity with the statutory requirements is being drafted.

### THE FINAL RULE VIOLATES THE EB-5 REFORM AND INTEGRITY ACT REQUIREMENT TO SET FEES TO MEET DESIGNATED PROCESSING TIMES

66.     Plaintiffs repeat and incorporate herein by reference all previous allegations set forth in paragraphs 1 through 52 of this Complaint.

67.     Section 106(b) of the RIA mandates that the fees to be charged for EB-5-related services must be set at a level necessary to "attain the goal of completing adjudications on average, not later than" 90 to 240 days after receiving a petition. Specifically, the processing times mandated in the RIA are as follows:

- 180 days for the designation of a new regional center (Form I-956);

- 180 days for approval of a regional center project (Form I-956F);

- 90 days for approval of a regional center project in a targeted employment area (Form I-956F);

- 240 days for an investor in a regional center project (Form I-526E);

- 120 days for an investor in a regional center project in a targeted employment area (Form I-526E); and

- 240 days for an investor's petition for removal of conditions on residence (Form I-829).

Pub. L. 117–103, div. BB, §106(b), Mar. 15, 2022, 136 Stat. 1103.

68.     An example of the reason why Congress emphasized addressing processing times and setting fees accordingly is the processing times for regional center investor petitions (Form I-526 and I-526E).

69.     As of the date of this Complaint, USCIS published processing times for these petitions range from 54.5 <u>months</u> to 89 <u>months</u>. USCIS, *Check Case Processing Times*, available at: <u>https://egov.uscis.gov/processing-times/</u> (last accessed April 5, 2024).

70.     Another example is Form I-829. By regulation, USCIS must make a decision within 90 days. 8 C.F.R. §216.6(c)(1). USCIS' latest published processing time is 58 <u>months</u>. *Id.*

71.     USCIS, in setting the new EB-5 fees, admitted that it did so without any reference to processing times. In fact, USCIS expressly stated that it "cannot commit to across-the-board processing time reductions" 89 Fed. Reg. 6287 (Opining that the congressional mandates are unrealistic).

72.     The Final Rule makes no reference to EB-5 filing fees being set at a level that would improve processing times at all, let alone meet the statutory times set forth in the RIA.

73.     More fees do not mean more productivity. In FY2016, the filing fee for Form I-526 was $1,500. In DHS' 2016 rulemaking, this amount was raised to $3,675. However, productivity fell sharply. Form I-526s were adjudicated, on average, in 16 months in FY2016. By FY2020, the processing time nearly doubled to 31.1 months. *See* USCIS, *Historical National Median Processing Time (In Months) for All USCIS Offices for Select Forms by Fiscal Year*, available at: https://egov.uscis.gov/processing-times/historic-pt-2 (last accessed March 29, 2024).

74.     The Final Rule was issued in complete disregard of, and in violation of, the RIA and admittedly will not result in USCIS complying with the processing times set forth in the RIA.

### USCIS ALLOCATED COSTS OF OTHER PROGRAMS TO EB-5 IN VIOLATION OF STATUTORY REQUIREMENTS

75.     Plaintiffs repeat and incorporate herein by reference all previous allegations set forth in paragraphs 1 through 52 of this Complaint.

76.     The relevant law governing USCIS fees is set forth in INA § 286(m), as superseded relating to EB-5 adjudications by RIA § 106.

77.     INA § 286(m) states, in relevant part: "that fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing such services, including the costs of similar services provided without charge to asylum applicants or other immigrants."

17

78.     Section 106(b) of the RIA revises § 286(m) relating solely to EB-5 adjudications as follows: "Notwithstanding § 286(m) of the Immigration and Nationality Act (8 U.S.C. §1356(m)), and except as provided under subsection (c), the Director…shall set fees for services provided under [EB-5] at a level sufficient to ensure the full recovery only of the costs of providing such services, including the costs of attaining the goal of completing adjudications, on average [within specific time frames ranging from 90 to 240 days]".

79.     RIA Section 106(c) further limits § 286(m) regarding adding to EB-5 fees the costs of other immigration programs not related to EB-5 as follows: "Fees in excess of the fee levels described in subsection (b) may be charged only (1) in an amount that is equal to the amount paid by all other classes of fee-paying applicants for immigration-related benefits, to contribute to the coverage or reduction of the costs for processing or adjudicating classes of immigration benefit applications that Congress, or the Secretary of Homeland Security in the case of asylum applications, has authorized to be processed or adjudicated at no cost or at a reduced cost to the applicant."

80.     RIA section 106(c), by its terms, prohibits USCIS from allocating a greater share of the costs of adjudicating other immigration benefits to EB-5 than to other categories based on ability to pay or any other mechanism.

81.     Contrary to Section 106(b) and (c), using an "ability to pay" methodology, USCIS set EB-5 fees by allocating the costs of non-EB-5 related programs in a proportion far greater for EB-5 than other fee-paying applicants and well in excess of the amount necessary to recover the costs of EB-5 services and without any reference to completing adjudications on a timely basis.

82.    USCIS concedes that its revised fees for EB-5 petitions exceed the estimated full cost of adjudications because "the fees include amounts needed to recover costs associated with processing other workloads where fees are insufficient".  88 Fed. Reg. at 510.

83.    The Final Rule explains that fee waivers are required in certain cases unrelated to EB-5 and that other fee-paying product lines must bear a portion of the cost of such applications. However, by law the allocation of such costs to EB-5 should be no more burdensome than the share apportioned to other employment-based filings. 89 Fed. Reg. at 6286.

84.    The Final Rule allocates a disproportional amount of costs to Forms I-956 and I-956F filings to recover costs associated with reduced fee or fee waiver cases, than it allocates to Forms I-129 and I-140 filings, which violates the statutory restrictions by requiring EB-5 regional centers to shoulder a greater allocation of unrelated USCIS costs than employer-petitioners filing I-129 and I-140 petitions.

85.    In violation of the RIA, USCIS states that it allocates a substantially higher burden of fees to EB-5 regional centers as opposed to other companies filing employment-based petitions because of the greater ability to pay of EB-5 regional centers. 88 Fed. Reg. at 510. However, USCIS admits that it has no insight into the revenues or profitability of regional centers.

86.    In fact, most EB-5 regional centers and EB-5 investors have far less "ability to pay" than petitioners applying for other immigration benefits. For example, thousands of nonimmigrant petitions per year are filed by some of the largest and most profitable companies in the world, including Amazon.com Services, LLC (over 11,300 petitions); Google, LLC (over 5,400); Microsoft Corporation (over 4,700); and Apple, Inc. (over 3,800). USCIS, *H-1B Data Hub,* FY2023, available at: https://www.uscis.gov/tools/reports-and-studies/h-1b-employer-data-hub. These companies and many others have a far greater ability to pay than any EB-5 regional center.

87.    The regional center plaintiffs in this case are among the oldest and largest regional centers in the industry. Although they are rightly proud of their success, their "ability to pay" is dwarfed by the massive employers that USCIS has arbitrarily decided these plaintiffs should subsidize. For example, the largest of the regional center plaintiffs employs [60] people; Apple employs over 3,000 H1-B employees – [50] times the headcount of the largest plaintiff – which themselves are a fraction of its 161,000 total employees. Even more telling: the regional center plaintiffs had average revenues more than 10,000 times less than many of the larger companies that petition for benefits from USCIS.

88.    In the Final Rule, USCIS allocated to EB-5 filing fees millions of dollars of non-EB-5 costs to pay for expenses relating to the processing of benefit applications other than EB-5.

89.    USCIS' improper allocation of non-EB-5 costs to EB-5 petitioners is unreasonable, arbitrary and capricious and in violation of law.

90.    USCIS has violated the law and acted in complete and knowing contravention of the congressionally-mandated fee-setting requirements, including failing to comply with congressional deadlines, failing to complete a fee study, failing to set fees to meet specific processing times established by statute and allocating additional fees to EB-5 related petitions far in excess of amounts allocated to applicants for other immigration-related benefits contrary to law.

## USCIS IMPROPERLY ALLOCATED ENFORCEMENT COSTS IN
## SETTING EB-5 FEES

91.    Plaintiffs repeat and incorporate herein by reference all previous allegations set forth in paragraphs 1 through 52 of this Complaint.

92.    Fees collected for adjudications are deposited in the Immigration Examinations Fee Account ("IEFA"). USCIS does not have boundless authority to use fees collected through the

Immigration Examinations Fee Account. It can only use such fees to cover the cost of providing adjudication and naturalization services. *See*, INA § 286(m); *see also*, 8 U.S.C. § 1356(m)

93.     An opinion by the General Counsel of the INS (USCIS' predecessor agency) in the years following the enactment of INA § 286(m) interpreted the term "adjudication and naturalization services" to exclude enforcement. *See* 1994 General Counsel's Opinions, 9 Immigrant Law Service 2d PSD 1994 General Counsel Opinions, Opinion 94-8 ("[F]ees which may be deposited into the Examinations Fee Account are those fees which arise from applications that are processed as part of the INS's adjudication service and not its enforcement function. Funds from the Examinations Fee Account may be expended only to reimburse an appropriation for expense incurred in providing adjudicative and naturalization services.").

94.     USCIS states that its fee increases are justified, in part, by its obligation to investigate "suspected fraud by Regional Center and related entities and to take other actions to ensure the integrity of the Immigrant Investor (EB-5) program." 89 Fed. Reg. at 6247.

95.     In fact, the RIA created separate fees to deter and investigate fraud.

96.     For example, the RIA established an "integrity fee" of $20,000 per regional center ($10,000 for regional centers with twenty or fewer investors), payable each year to deter and investigate fraud.  8 U.S.C. § 1153(b)(5)(J)(ii). This fee was not taken into account in establishing the new EB-5 fees.

97.     Another example is that USCIS states that the costs associated with the Administrative Site Visit and Verification Program established by the RIA are added to the I-829 fees. 89 Fed. Reg. at 6248.  In fact, the RIA establishes separate fees to investigate fraud in I-829 and other EB-5 related petitions. 8 U.S.C. § 1153(b)(5)(J)(iii)(II)

98.    The Final Rule relating to EB-5 fees should be set aside because it improperly allocates enforcement-related fees to fees for EB-5 adjudications.

## USCIS VIOLATED INA § 286(m) BY FAILING TO DETERMINE THE COSTS OF PROVIDING EB-5 SERVICES

99.    Plaintiffs repeat and incorporate herein by reference all previous allegations set forth in paragraphs 1 through 52 of this Complaint.

100.    INA § 286(m) requires USCIS to set fees at a level that will ensure recovery of the "full costs of providing [EB-5 services]".

101.    USCIS has not determined the full costs of providing EB-5 services and thus has violated § 286(m).

102.    USCIS states in the Final Rule that it "conducted a comprehensive biennial fee review and determined that current fees do not recover the full costs of providing adjudication and naturalization services." 89 Fed. Reg. at 6194.

103.    USCIS states that it requires most employees who adjudicate immigration benefit applications to report adjudication hours and case completion by benefit type and that this data is used to determine fees. However, USCIS admits that, with respect to EB-5, USCIS does not have this data and did not set fees based on this data, but rather used "subject matter expertise" to estimate completion rate. 89 Fed. Reg. at 6287 ("The completion rates are estimates developed by Office of Performance Quality, using data and subject matter expert input from the Field Operations Directorate's (FOD's) IPO.").

104.    The Final Rule uses an "activity-based cost" model to assign fees to other benefit applications, based on the average cost to USCIS to adjudicate a given type of form.

105.    With respect to EB-5, as opposed to other fees, the Final Rule fails to apply a data driven analysis in setting EB-5 fees, but instead applies unexplained "value judgments" and relies

on unexplained and irrational economic assumptions that are contradicted by data. 89 Fed. Reg. at 6331 ("[As to] this final rule, how we have assigned and shifted USCIS operating costs [is] based on relative complexity of the adjudication and value judgements about the specific benefit requested.").

106.    With respect to EB-5 fees, USCIS states that it did not, and is not required to, calculate the amount of time required to process EB-5-related petitions and that it did not determine the costs of providing EB-5-related services. Rather, USCIS states that it relies on "surveying personnel on EB-5 processing requests", which procedure is undefined. USCIS states that it "estimated the EB-5 workload based on statistical model income, immigration receipt data and internal assessments." *Id.* at 6288. However, USCIS provides insufficient information for public comment on the statistics it used, the data it used, or the assessments it made.

107.    Despite significant changes in the law and operation of the EB-5 program, USCIS set fees based on staffing needs that do not account for such changes and for future needs and processing backlogs.

108.    The EB-5 fees in the Final Rule are arbitrary and capricious and in violation of law in that USCIS did not accurately determine the cost of providing such services, did not base the fees on actual time spent adjudicating cases and did not credibly estimate the amount of time required to process EB-5-related petitions. As such, the EB-5 fees in the Final Rule should be set aside.

### THE EB-5 FEE INCREASES IN THE FINAL RULE ARE BASED ON INCORRECT AND UNREALISTIC VOLUME FORECASTS

109.    Plaintiffs repeat and incorporate herein by reference all previous allegations set forth in paragraphs 1 through 52 of this Complaint.

110.    USCIS states that "projected volumes and completion rates are two of the main drivers in the fee review." 88 Fed. Reg. at 509. As explained below, USCIS' calculations and estimates of both projected volumes and completion rates are inaccurate.

111.    As USCIS explains, as the number of receipts go up, the calculated fee per receipt comes down; and when the estimate of future volume of receipts underestimates the number of receipts, the calculated fee per receipt goes up.

112.    USCIS admits that, when its EB-5 work volume estimates are reduced, it "contributes to significantly higher fee-paying unit costs in the ABC model because fewer fee-paying customers are available to cover the cost of the workload." 88 Fed. Reg. at 510. In calculating "full costs" to run USCIS' operations, USCIS officials have admitted under oath that the time to adjudicate some EB-5 related petitions (e.g., Form I-526) is not actually traced. See, *Nadhar v. Renaud*, ECF Doc. No. 39-1 CV-21-00275-PHX-DLR (June 8, 2021).

113.    USCIS admits that it set fees for EB-5 applications based on "estimates" and "surveys" of its personnel, which do not take into account the impacts of the RIA, volume projections and new forms and are otherwise inaccurate. 89 Fed. Reg. at 6287.

114.    USCIS admits that the EB-5 data set forth in the proposed rule were based on incorrect EB-5 volume forecasts, which were corrected and updated "based on more recent and reliable information" in the Final Rule. *Id.* at 6196.

115.    However, even though the EB-5 fees set forth in the proposed rule were based on incorrect, unreliable and stale information, there were no changes in the EB-5 fees in the Final Rule. Specifically, although USCIS increased its projections of the number of EB-5 petitions and applications it expected will be filed annually by 9,435, it did not reduce the filing fees in the Final

Rule. As a result, the fees in the Final Rule are so high at least in part because the fees are based on an unrealistically small number of incoming EB-5 receipts to cover the costs.

116.    A good example is Form I-956, which must be filed by every new and existing regional center. In addition to the I-956 filing mandate, every regional center that seeks to offer EB-5 investment opportunities to individual investors must first file an I-956F Application for Approval of Investment in a Commercial Enterprise before any related I-526E petition may be filed by an investor. I-956F is a new form and process created by the RIA. It is unlike the previous Form I-924, which could optionally be used as an "exemplar" to request project approval (an option that many regional centers chose not to exercise considering the disincentives of long processing times, lack of deference, and added cost). Form I-956F is not an option; and I-956F must be filed for every single regional center project offered to investors.

117.    In the proposed rule, DHS estimated 62 annual I-956 filings. In the Final Rule, the estimate increased to 400. *Id.* at 6211. Yet the fee contained in the Final Rule remained exactly the same as in the proposed rule. *Id.* at 6198-6205

118.    400 I-956 filings per year would net the agency more than $19 million in fee revenue.

119.    According to USA Jobs, an Immigration Services Officer, charged with adjudicating immigration benefits, is a GS 11-12 level employee, with a salary around $75,000 per year.

120.    It takes two I-956 application filing fees to pay the salary of one adjudicator for an entire year.

121.    In the Final Rule, USCIS also projects to receive 600 I-956F applications per year, for the same $47,695 filing fee.  Between the two, that would be $47,695,000 in revenue, more than enough to pay the salaries of 500 adjudicators. *Id.* at 6211.

122.    The NPRM determined the cost input for Forms I-956 and I-956F (share of resources necessary for IPO to sustain operation and deliver services) is $2,177,846 per year. The NPRM then divided this figure by the number of expected receipts per year to determine the estimated cost per filing. In this case, the NPRM assumed a total of **only 62** I-956 and I-956F filings per year. Dividing $2,177,846 by 62 produces a cost per I-956 or I-956 F of $35,127. The NPRM then proposed to add what it deems is the EB-5 industry's fair share of non-EB-5 USCIS costs in the amount of $12,568 per filing, for a total filing fee of $47,695.  89 Fed. Reg. at 6375.

123.    But the Final Rule projects 1,000 combined receipts for I-956 and I-956F.

124.    Although the cost per applicant goes down as the number of filings goes up, despite the massive increase in the projected number of filings, the filing fee did not change between the NPRM and the Final Rule.

125.    By setting fees at a level necessary to recover the costs to process 62 I-956/I-956F applications, instead of the newly projected 1,000, USCIS is treating EB-5 revenue as a windfall to subsidize the rest of the agency.

126.    By basing a fee rule on purely speculative and unexplained projections, USCIS not only risks over or under charging EB-5 applicants and petitioners, but it risks its entire budget.

127.    If two I-956 applications can pay for one adjudicator's salary for a year, there would be a rather dramatic impact on agency staffing if the projected number of I-956 applications were off by 60% or more.

128.    Thus, the accuracy of the EB=5 projections is just as important to asylum and naturalization adjudications as it is to the processing of EB-5 matters.

129.    The lack of a clear, transparent and reasonable basis for the EB-5 receipts projections is all the more arbitrary and capricious when Defendants are planning to support other agency activity with EB-5 revenue. Moreover, there is no actual basis for the projections to be found in the NPRM or the Final Rule.

130.    For instance, how did Defendants get from a paltry 62 to 1,000? Surely, it is not historical data, as the USCIS' data for FY 2023 shows 274 I-956 applications and 185 I-956F applications filed in FY 2023.  USCIS, *All USCIS Application and Petition Form Types (Fiscal Year 2023, Quarter 4)*, available at: https://www.uscis.gov/tools/reports-and-studies/immigration-and-citizenship-data?topic id%5B%5D=33700&ddt yr=&query=&items per page=10 (Dec. 29, 2023).

131.    Even in the Final Rule, USCIS states that it cannot yet accurately estimate the impacts on filing volumes. *Id.* at 6375.

132.    Many of the incorrect and unrealistic volume forecasts were referenced in Plaintiff IIUSA's comments to the proposed rule, which were unrebutted by USCIS.

133.    Another USCIS policy that impacts the number of filings is the requirement that regional centers file an I-956 Application for Regional Center Designation as an amendment in the following circumstances:

-    Changes to the regional center's name

-    Changes to the regional center's ownership

-    Changes to the regional center's organizational structure or administration

-    Sale of the regional center

27

-    Other arrangements, such as a new hire, or a promotion, that would result in individuals not previously subject to the bona fides verification requirements under INA § 203(b)(5)(H) becoming involved with the regional center.

-    Changes to the geographic area of the regional center.

134.    *See* USCIS, *Instructions for Form I-956, Application for Regional Center Designation*, available at: https://www.uscis.gov/sites/default/files/document/forms/i-956instr.pdf (last accessed March 5, 2024).  These I-956 amendment filings are required to inform USCIS of events that are literally inevitable in the ordinary course of business. Regional centers will be bought and sold, their equity ownership will change as interests are issued to employees or passed down through inheritance, their organizational structures will change in response to market conditions, tax considerations, regulatory posture – the list goes on. Under the Final Rule, each and every time one of these common events occurs, USCIS demands $47,695 merely to be informed of that fact. The agency made no distinction between these routine notice filings and a full I-956 petition to establish a de novo regional center. These routine amendment filings will almost certainly materially increase the volume of I-956 receipts.

135.    The Final Rule is arbitrary and capricious in that it sets fees based on incorrect and unrealistic volume forecasts.

### THE EB-5 FEE INCREASES ARE BASED ON INCORRECT ESTIMATES OF THE COST OF PROVIDING SERVICES

136.    Plaintiffs repeat and incorporate herein by reference all previous allegations set forth in paragraphs 1 through 52 of this Complaint.

137.    In addition to clear errors in case filing estimates in the different form categories which USCIS conceded in the preamble to the Final Rule, USCIS failed to determine the actual

costs of providing EB-5-related services as required by INA § 236(m). To the extent it provided estimates of such costs, such estimates are clearly incorrect.

138.    An example is Form I-956, for which the fee increases in the Final Rule from $17,795 to $47,695, an increase of almost 200%. In setting this fee, USCIS arbitrarily fails to distinguish between three different applications. One application is the filing of Form I-956 for a new regional center application. The second is the filing of Form I-956 simply to notify USCIS of a change in a manager, a change in ownership (even small minority ownership) of the regional center, or even simply a change in the name of the regional center. A third is a change to an existing regional center's approved geographic territory.

139.    The three types of I-956 filings involve substantially different levels of adjudication and effort by USCIS.

140.    For instance, USCIS' authority to deny a name change for a regional center is limited to cases in which the name is already being used, or is so similar to a name already being used as to be likely to cause confusion, or where the name would falsely give the impression that the regional center is a government entity.  There is no statutory or regulatory authority, or even published policy, that gives USCIS the authority to be the "name police."  The adjudication should take mere minutes for which Plaintiffs would be required to pay a $47,695 filing fee.

141.    Even under the "ability to pay" concept, a fee this high exceeds any notion of fundamental fairness and is arbitrary and capricious.

142.    A change in management or ownership would require the completion of additional background checks on the new owners or managers, but if the new owners or managers are not prohibited under 8 U.S.C. § 1153(b)(5)(H), Defendants lack any legal basis on which to deny the application, so adjudication is both narrow and simple.

143.    It similarly cannot rationally justify a $47,695 filing fee.

144.    If a USCIS adjudicator were only expected to process two such applications per year to earn his or her pay, it might very well be the best hourly rate of any job in existence, and would certainly be the epitome of government waste.

145.    An I-956 application for initial designation as a regional center requires evaluation of the regional center's proposed economic impact, job creation, and policies and procedures for compliance with the laws of the United States, securities laws, and program requirements.  It is certainly more complex than the prior types of adjudications.

146.    A regional center must file an I-956F for approval of an investment in a commercial enterprise before any investor can file an I-526E petition. The I-956F must include a business plan, economic report, private placement memorandum (or other disclosure document), subscription agreement, escrow agreement and myriad other documents.

147.    A typical I-956F application contains several thousand pages.

148.    It is, no doubt, a more involved adjudication, requiring more specialized knowledge.

149.    It is irrational for the cost to be the same as the adjudication of a change in the name of the regional center entity.

150.    Since the I-956F must be filed before the project can recruit a single investor,  there is no guarantee at the time of filing that a project will ever recruit a single investor.

151.    The Final Rule increases the cost of this speculative application by approximately $30,000, which may well preclude some otherwise legitimate job creating projects, particularly in rural or high unemployment areas, from utilizing the EB-5 program.

152.    There is no evidence that Defendants have considered the potential chilling effect on the EB-5 program resulting from the Final Rule.

153.    USCIS' response in the Final Rule is in effect "we don't care, EB-5 applicants can afford to pay."

154.    On this point, USCIS provides no evidence or analysis.

155.    Another example of the fees in the Final Rule being arbitrary and capricious is the fee for Form I-526E filed by investors in regional centers. Prior to the RIA, most of the adjudication time for the I-526 petition was spent adjudicating the project. This is a substantial undertaking, including review of offering documents, loan agreements, economic reports, business plans and other documents. Because, pursuant to the RIA, adjudication of the project is no longer done as part of the I-526E adjudication but rather through the separate Form I-956F (which has a separate fee), the only task for an adjudicator reviewing the I-526E is reviewing the investor's source and path of funds.

156.    Although the cost of adjudicating the I-526E petition is substantially lower given that most of the adjudication time is spent adjudicating the I-956F, USCIS estimates the number of hours required to adjudicate an I-526E petition will increase from 6.5 hours to 20.69 hours, or a 218% increase. 88 Fed. Reg. at 448 (Table 10); *see also, Id.* AT 509 ("In the FY 2022/2023 fee review, USCIS estimates that the completion rate for Forms I-526 and I-526E is 20.69 hours, a 14.19 hour or 218 percent increase.")

157.    Based on this patently illogical estimate, the Final Rule increases the filing fee for individual investors by over 200%.

158.    The arbitrary and capricious fee increase of over 200% for investors filing Forms I-526E will logically have a dampening effect on investors' interest in the regional center EB-5

program and ability to fund an EB-5 investment. This is especially true given that the total filing fees for EB-5 investors (including Forms I-526E and I-829) increased by $13,260. The expected dampening of interest by investors who will have to pay an additional $13,260 will deleteriously impact the business of the regional center plaintiffs.

159.    As with the I-956 and the I-956F, USCIS does not distinguish between Form I-526 (filed by standalone investors) and Form I-526E (filed by regional center investors) petitions, assuming they are essentially the same form and have identical workloads. *See* 89 Fed. Reg. at 6198-6205 (Table 1).

160.    In fact, the new I-526E petition has half the content of the new I-526 petition. Neither petition is identical to the previous I-526 petition. Although adjudication of I-526E petitions is greatly simplified under the RIA by virtue of the fact that it incorporates by reference the related I-956F filing, the adjudicator adjudicating the I-526 petition must also adjudicate the qualification of the EB-5 project.

161.    The Final Rule is arbitrary and capricious in that the fees bear no relationship to the actual cost of providing the service.

### THE FINAL RULE VIOLATES THE REGULATORY FLEXIBILITY ACT

162.    Plaintiffs repeat and incorporate herein by reference all previous allegations set forth in paragraphs 1 through 52 of this Complaint.

163.    The Regulatory Flexibility Act of 1980, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 ("RFA"), requires federal agencies to consider the potential impact of regulations on small businesses. *See* 5 U.S.C. 601 *et seq.* The Final Rule is subject to the requirements of the RFA. *See* 89 Fed. Reg. at 6374-76 (Defendants' RFE analysis as applied to regional centers).

164.    Consistent with the requirements of the RFA, USCIS provides a fee discount to "small employers", which it defines as having 25 or fewer full-time equivalent employees. 8 C.F.R. 106.1(f). Although it provides this benefit for companies applying for other immigration benefits, it fails to do so for regional centers, such as plaintiffs, which are applying for EB-5 benefits. *See* 89 Fed. Reg. at 6374-76.

165.    USCIS states that it utilizes the "ability to pay principle" in determining fees and that "a discount based on the size of the business is consistent with the ability to pay principle". 89 Fed. Reg. t 6209. Nevertheless, USCIS did not provide a discount in the case of EB-5 fees for regional centers.

166.    USCIS has the ability to determine which regional centers have 25 or fewer employees in the same way that it makes this determination with respect to companies filing for other types of immigration benefits.

167.    In fact, most EB-5 regional centers, including most of the plaintiffs, have fewer than 25 employees.

168.    USCIS filing fees are reduced for small employers filing other petitions, such as Forms I-129 and I-140. *See* 89 Fed. Reg. at 6241 ("Businesses with 25 or fewer employees will pay a $200 Asylum Program Fee instead of the $600…"); *see also*, *Id.* at 6195 ("In the final rule, DHS…reduces [the I-140 fee] for small employers."

169.    Form I-956, I-569F and I-956G filed by regional centers are subject to the RFA.

170.    DHS states that it "assumes existing regional centers with revenues equal to or less than $447,000 per year…could experience a significant economic impact if DHS assumes a fee increase that represents one percent of annual revenue is a 'significant' economic burden under the RFA". 89 Fed. Reg. at 6376.

33

171.    The increase of filing fee for every I-956 and every I-956F application filed by a regional center from $17,795 to $47,695 constitutes a significant economic burden to most regional centers, including members of plaintiff IIUSA, many of which have revenues under $447,000.

172.    USCIS concedes that it did not comply with the RFA in determining the potential impact of the EB-5 fee increases on small business because it (a) "does not have sufficient data on revenue collected to determine the economic impact on small entities", *Id.* at 6354; (b) "was not able to determine the number of regional centers that would be considered small entities", *Id.* at 6360; and (c) was not able to accurately estimate the impact of the RIA on filing volumes for small entities, *Id.* at 6375. These reasons are incorrect factually and legally deficient.

173.    USCIS admits in the Final Rule that it cannot "definitely claim no significant economic impact to small entities" as required by the RFA and that there could, in fact, be a "significant economic impact" to many regional centers from the increased fees, contrary to the requirements of the RFA. 89 Fed. Reg. at 6376.

174.    The Small Business Administration has advised USCIS that its Final Rule is deficient under the RFA. U.S. Small Business Administration, Office of Advocacy, *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*, available at: https://advocacy.sba.gov/wp-content/uploads/2023/03/Comment-Letter-USCIS-Fees-Rules-508c.pdf (Mar. 10, 2023).

175.    For these reasons, the Final Rule is in violation of the RFA and must be overturned and held invalid consistent with the requirements of the RIA.

## THE FINAL RULE DID NOT COMPLY WITH THE NOTICE
## REQUIRED BY THE APA

176.    Plaintiffs repeat and incorporate herein by reference all previous allegations set forth in paragraphs 1 through 52 of this Complaint.

4853-7042-0140, v. 4

177.    The NPRM did not provide the data on which USCIS relied in determining EB-5 fees.

178.    Public access to such data is a requirement of the notice and comment provisions of the APA. 5 U.S.C. § 553(c).

179.    In the NPRM, USCIS stated that the public may access the data "on-site, by appointment, by calling 240-721-6080." 88 Fed. Reg. at 404.

180.    In fact, the number provided for the public to access the critical data to be able to comment on the proposed rule belonged to a private citizen with no affiliation to DHS, or to USCIS, or to the fee rule data.

181.    As such, the public had no or insufficient access to the data necessary to determine how USCIS calculated the proposed fees.

182.    The Final Rule was published in violation of law in that it failed to comply with the Administrative Procedure Act's notice provisions.

**THE FINAL RULE VIOLATES OMB CIRCULAR A-25**

183.    Plaintiffs repeat and incorporate herein by reference all previous allegations set forth in paragraphs 1 through 52 of this Complaint.

184.    In its final rule, USCIS states that it is following OMB Circular A-25 in its promulgation of the fee rule.

185.    OMB Circular A-25 sets forth the procedure to be followed by a government agency when there are statutory limitations on fees that would be inconsistent with the fees proposed by the agency: "When there are statutory prohibitions or limitations on charges, legislation to permit the charges to be established should be proposed. In general, legislation should seek to remove

restraints on user charges and permit their establishment under the guidelines provided in this Circular."

186.    USCIS chose not to seek legislation to remove the constraints provided by the RIA in violation of OMB Circular A-25.

187.    USCIS' action in purporting to comply with OMB Circular A-25, but disregarding a key provision, is arbitrary and capricious.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

A.  Declare the portion of the Final Rule relating to EB-5 related petitions unlawful and invalid.

B.  Declare that Defendants' action in publishing the Final Rule is arbitrary and capricious, in violation of the EB-5 Reform and Integrity Act, in violation of the Regulatory Flexibility Act, in violation of OMB Circular A-25 and procedurally in violation of the Administrative Procedure Act.

C.  Enjoin Defendants from implementing or enforcing the Final Rule.

D.  Enter an Order that mandatorily enjoins Defendants to comply with the RIA and to issue a fee study in compliance with the RIA within 90 days.

E.  Order Defendants to refund fees in excess of the fees that would have been paid pursuant to the fee schedule in place prior to the Final Rule.

F.  Award Plaintiffs reasonable counsel fees and costs pursuant to 28 U.S.C. § 2412; and

G.  Order such other relief as the Court deems just and equitable.

Dated: April 22, 2024                                  Respectfully submitted,


                                                  /s/ H. Ronald Klasko

                                                  H. Ronald Klasko
                                  **KLASKO IMMIGRATION LAW PARTNERS, LLP**
                                                  1601 Market Street,
                                                  Suite 2600
                                                  Philadelphia, PA 19103
                                                  Telephone: (215) 825-8600
                                                  Facsimile: (215) 825-8699
                                                  Email: rklasko@klaskolaw.com

                                          **CO-COUNSEL ATTORNEY**

                                                  /s/ Brian Scott Green

                                                  Brian Scott Green
                                  **KLASKO IMMIGRATION LAW PARTNERS, LLP**
                                                  1601 Market Street,
                                                  Suite 2600
                                                  Philadelphia, PA 19103
                                                  Telephone: (215) 825-8600
                                                  Facsimile: (215) 825-8699
                                                  Email: bgreen@klaskolaw.com

                                              Attorneys for Plaintiffs